UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                    Plaintiff,              Case No. 23-cr-20221

     v.

                                 Hon. Linda V. Parker

Socorro Alejandro Palacios,

                    Defendant.

_____/

**Socorro Alejandro Palacios' Sentencing Memorandum**

Socorro Alejandro Palacios is still a young person who has not reached 25 years of age. He grew up in a mixed-immigration status family with challenges that imposed and continue to impose commitments before he even had a realistic opportunity to complete middle school.

As a United States citizen, he navigated a world where his father's immigration status would result in removal from this country. Mr. Palacios' father's removal in 2011 led to a spiraling of his world: both the economic life in the home and his mother's health. A world where he left schooling to work and support the family doing child labor in the tobacco fields even though he is the youngest of three siblings. A commitment to economically providing for his parents that now live outside of the U.S. while he works on himself to

obtain better and consistent employment. He's taken affirmative steps to improve his life during this year of pretrial release.

Here, the Probation Department calculated a sentencing guideline range of 6 to 12 months. A sentence of "time served" with a term of no more than 12 months supervised release fulfills the "overarching" command of 18 U.S.C. § 3553(a): that a sentence be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation.

### I. Mr. Palacios' Childhood was one of Child Labor with Adult Responsibilities.

Socorro Alejandro Palacios was born in Lansing, Michigan, to Norberto Rodríguez Canadá and Leticia Vilma Palacios. He is the youngest of three children, with brother Luis Miguel and sister María Luisa being near in age to him.



Luis Miguel, María Luisa, and Socorro (bottom)

2

It was a demanding upbringing. What made life particularly difficult is that it was a mixed-immigration status family, meaning that at least one parent was a noncitizen without lawful immigration status to remain in the United States. Mr. Palacios' father lacked lawful status. The family depended on his father's employment for economic survival. This required frequent moves in Michigan and to Tennessee in search of mostly seasonal employment opportunities. It is important to understand the effect of growing up in a mixed-immigration status family on a child to understand Mr. Palacios.

It is widely documented that challenges faced by mixed-immigration status families are vast. Of the 16.7 million people that are part of mixed-status families, it is estimated that 5.9 million children in such families are U.S. citizens.[1] Children in mixed-status families have worse physical health outcomes when compared to parents that are both U.S. citizens.[2] They tend

---

[1]    Silvia Mathema, *State-by-State Estimates of the Family Members of Unauthorized Immigrants*, American Progress (Mar. 16, 2017), *available at* https://www.americanprogress.org/article/state-state-estimates-family-members-unauthorized-immigrants/ (last accessed May 1, 2024).

[2]    Edward D. Vargas and Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, 19 J. Immigr Minor Health 913-20 (Aug.. 2017), *available at* https://perma.cc/7GHJ-J3WS.

to have less access to health insurance and experience psychosocial effects such as high levels of stress.[3]

When a parent is removed from the U.S., their children are likely to experience elevated mental health problems, decreasing school performance or leaving school altogether, symptoms of depression, and internalized stress as anxiety.[4] And the fear and actual removal of a parent further negatively impacts general emotional and physical health.[5] It also heightens problems paying rent/mortgage, food insecurity, and puts a family within the sphere of income below 200 percent of the federal poverty level at a higher rate.[6] These effects cut deep into the Rodríguez and Palacios family and Mr. Palacios' childhood.

The federal government removed Mr. Palacios' father during his childhood. Mr. Palacios was approximately 12 years old and in middle school. Such removal caused substantial stress on him, his mother, and the need for

---

[3]    *Id.*

[4]    Brian Allen et al, *The Children Left Behind: The Impact of Parental Deportation of Mental Health*, 24 J. Child and Fam Studies 386-92 (2015).

[5]    Division 27 of Am. Psych. Asso., *Statement on the Effects of Deportation and Forced Separation on Immigrants, their Families, and Communities,* 62 Am. J. Comm Psych  3-12 (July 31, 2018), *available at* https://perma.cc/R6R8-BJBS.

[6]    Diane Guelespe et al, Urban Institute, *Mixed-Status Immigrant Families Disproportionately Experienced Material Hardships in 2021* 2-3 (Feb. 2023), *available at* https://perma.cc/Z8K3-E9QW.

him to "step up" financially. *See* PSR ¶ 41. The family lived in Tennessee during that time. He was pushed out of school in exchange to work as a child laborer.

Mr. Palacios worked in the tobacco fields. He did so to  "maintain the household," that meant him paying "rent [of $]600.00 a month and all the utilities" that were another $500 to $600 a month. Ex. A – Letter from Leticia V. Palacios, at 1. He planted, watered, cleaned, cut, and did other tasks in the fields. Ex. A at 1. As a child laborer, he withstood the blistering work because his family needed him even though children working in tobacco fields face a litany of health risks.[7]

During that time, his mother became sick and stopped working. His mother writes: "It was a hard time for me and my children, due to me becom[ing] sick, so all of us suffered and all three had to grow up fast." Ex. A at 1. The family received health insurance and food assistance through

---

[7]     *See*, *e.g.*, Anita Wadhwani, *Kids work on Tennessee's tobacco farms with few protections*, The Tennessean (Sep. 8, 2014), *available at* https://perma.cc/VU25-XZYP; Anita Wadhwani, *Report: Tobacco fields poisoning kids*, The Tennessean (May 14, 2014), *available at* https://perma.cc/7TDB-5MEP; Kaitlyn Radde, *12-year-olds can't buy cigarettes – but they can work in tobacco fields*, NPR (Apr. 18, 2023), *available at* https://perma.cc/J272-JDEY; Ariel Ramchandani, *The Overlooked Children Working America's Tobacco Fields*, The Atlantic (July 21, 2018), *available at* https://perma.cc/JSU8-CT4Q; Athena K. Ramos, *Child Labor in Global Tobacco Production*, 20 Health Hum Rights 235-48 (Dec. 2018), *available at* https://perma.cc/49LF-ZC7Q.

government support after his mother stopped working. Even so, Mr. Palacios remained at work until age thirteen when the family lost the house. Such loss resulted in a reunification of the entire family with his father in México.

Once in México, Mr. Palacios remained dutybound to work instead of going to school. He mostly worked in construction and repairing houses. Earning a living was extremely difficult and he decided to return to the U.S. ate age fifteen to obtain better paying work. With no grounded household in the U.S., the flow then became moving back and forth between Michigan, Tennessee, and México to find and secure seasonal employment – just as the family did before. This is the pattern that continued until a period immediately preceding his arrest in this case.

Mr. Palacios' parents continue to live in México and do not work. His father suffers from a hernia and other medical issues. He is now 65 years old. Mr. Palacios' mother discussed some of her health issues with counsel and they include lung/breathing issues, pain in her knee and leg area, and herniated discs. Ex. A at 1. Mr. Palacios provides his parents money, and in helps his mother with food and medication to treat her lower lumbar area. Ex. A at 1. Mr. Palacios is always there for his mother "emotionally, mentally and physically in whatever" she needs. Ex. A at 1. He remains deeply devoted to her and her well-being.



Mr. Palacios and his mother

## II.    A Sentence of Time Served is Sufficient but Not Greater than Necessary

Mr. Palacios pled guilty to Count 1 in the Indictment charging him with violating 8 U.S.C. § 1324(a)(1)(A)(ii), transporting noncitizens that have not secured permission to enter the United States. Mr. Palacios pled pursuant to a Rule 11 agreement with the government. ECF No. 16.

This Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment" of this case. *Gall v. United States*, 552 U.S. 38, 50 (2007). The punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-488 (2011) (omitting citations). That is because the Sentencing Guidelines have a "real and pervasive effect . . . on sentencing." *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016).

*Advisory sentencing guidelines*: The Probation Department scored the base offense level as 12. The offense level of 12 is then reduced by 2 levels to 10 because of his acceptance of responsibility. The criminal history category is I. Probation's calculated advisory sentencing guidelines suggest an imprisonment range of 6 to 12 months.

Mr. Palacios received a copy of the initial presentence investigation report via Federal Express mail and reviewed it. Defense counsel submitted several corrections to the initial presentence investigation report (PSR). No objections were filed. The PSR writer reviewed the corrections and subsequently made edits. No edits, corrections, or additions identified by the defense remain. A copy of the final PSR was subsequently sent to Mr. Palacios via postal mail.

*Types of sentences available*: As the PSR identifies, according to the Judiciary Sentencing Information database, approximately 28% of persons sentenced under the same primary guideline, offense level, and criminal history category as Mr. Palacios received a sentence other than incarceration. PSR ¶ 94. For those sentenced to prison, the average and median sentence was five months. PSR ¶ 94. Both statutory and guideline provisions allow for probation as a sentence in this case. PSR ¶¶ 73-75.

Here, law enforcement arrested Mr. Palacios on March 25, 2023, and he remained in custody until released with bond conditions on March 27, 2023. Counsel submits that a "time served" sentence with a 12-month term of supervised release will fulfill the § 3553(a) goals and is a just punishment in this case. Section § 3553(a) factors provide support for this sentence.

*Deterrence as it relates to Mr. Palacios*: Mr. Palacios' conviction is something he has disclosed, though embarrassingly, to a few others. His mother did not know the full details until counsel explained the severity of it. And others will continue to know about his conviction and the criminal risks that transporting noncitizens – after entering through something other than a port of entry and without permission – subjects them to before federal courts.

This is not something that he envisioned near 1:00 am on March 25, 2023, when he was watching a movie with his significant other. Not what he thought would occur when he was driving to a location sent to him as a dropped pin in Harsens Island. And not something that the promise – not an actual payment – of $500 to transport persons to Lansing, Michigan, equates to an actual gain. Mr. Palacios' actions came from desperation after going through periods of unemployment, lack of consistent work hours in the winter of 2023, recent return to Ypsilanti from Memphis, Tennessee, and

9

pressure to assist his family. It was a rash decision made in the middle of the night.

Research consistently shows that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[8] "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."[9] The Department of Justice too recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[10] Here, it is what he experienced, not what happens to a stranger who is caught and subsequently punished, that is serving the more powerful form of deterrence.[11]

Mr. Palacios is making progress on this aberrant conduct in this case. He had to forfeit the vehicle he and his significant other used to get to work. This vehicle, a 2013 Dodge Avenger with an appraised value of $1,095, was

---

[8]     Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

[9]     *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

[10]    NAT'L INSTITUTE OF JUSTICE, *Five Things About Deterrence* (Jun. 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last accessed May 20, 2021).

[11]    Valerie Wright, Ph.D.: *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,* THE SENTENCING PROJECT (Nov. 2010).

seized by law enforcement during his arrest. About two months after his arrest and with the assistance of counsel, he received a notice from U.S. Customs and Border Protection that the vehicle was seized and he would need to proceed through an asset forfeiture process to seek a return of the vehicle along with paying any impound and accumulating storage fees. He simply did not have the money to pay for its removal from the impound. Since his arrest, he depends on friends and coworkers for transportation to court and work.

More importantly, Mr. Palacios regrets his actions completely. Aside from delaying his goal of bringing his family back to the United States, it also has delayed his ability to travel to México to visit with them. *See* PSR ¶ 20.

Mr. Palacios is now convicted of a federal felony – his first and only felony conviction. He's adhered to all the conditions set forth in his pretrial bond and tests as required. He successfully completed his probation term for the misdemeanor case. He's lost many rights because of the felony conviction and will endure scrutiny for the rest of his life. This all amounts to specific and clear deterrence to Mr. Palacios.

*Protecting the public:* In terms of protecting the public, during the law enforcement stop in this case, Mr. Palacios cooperated with law enforcement, waived *Miranda*, spoke about his actions, including providing

them access to his phone, and has maintained himself within the bounds of his bond restrictions.

The PSR, and in reviewing his history, does not suggest that there is information tying him to current or future danger to the public. PSR ¶ 89. Mr. Palacios understands that his actions of transporting noncitizens that are unvetted through a port of entry may have posed a danger to society at large. It is not something that he will engage in at any point in his future.



Mr. Palacios preparing to work on an industrial roof in early 2024

*Mr. Palacios' education and vocational needs*: During the pendency of this case, counsel and Mr. Palacios discussed his education and vocational needs. One area jointly identified was a need to complete secondary formal

education. The avenue then became his enrollment in an adult education program at Washtenaw Community College. He attends the program weekly through videoconference in preparation to obtain his general education development certificate (GED). Subject course testing preparation begins in May and this will help him redirect his focus on areas of subject improvement. At this point, the program aims to have Mr. Palacios formally test for the GED in June.

Obtaining his GED will then unlock other vocation training programs he wants to undertake such as carpentry and construction. Because BOP vocational programs in carpentry or other vocational areas require typically a sentence of 48 months, he will realistically not be eligible for training at the BOP if sentenced to prison within a guideline range. His current work is building flat roofs and installing sheet metal in industrial/business properties and working on smaller scale residential homes. During the winter, works hours and jobs lower in frequency but it has now increased to six-days-a-week work with long hours.

The most effective method to assist Mr. Palacios is to support him in his educational and vocational goals while completing a term of supervision in the community with no need for incarceration. A term of incarceration would derail him from the progress he's made since this case began.

## Conclusion

Counsel requests that this Court (1) accept the Rule 11, (2) sentence Mr. Palacios to "time served," (3) impose a term of supervised release of no more than 12 months, (4) and not impose a fine because of his lack of financial resources. Such a sentence allows Mr. Palacios to continue in the workforce to financially support his sickly parents in México, continue his studies with the goal of obtaining a GED, and develop further skills for job security that will avoid this situation from ever happening again.

Submitted,

s/ Fabián Rentería Franco
Fabián Rentería Franco
Counsel for Socorro Alejandro Palacios
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
T: (313) 463-6143
Dated: May 1, 2024           E: Fabian_Renteria_Franco@fd.org

14

## Certificate of Service

I certify that on May 1, 2024, the following documents

- Socorro Alejandro Palacios' Sentencing Memorandum
- Exhibits to Sentencing Memorandum

were filed with the Clerk of the Court using the CM/ECF system, which should send notification to opposing counsel.


s/ Fabián Rentería Franco
Fabián Rentería Franco